

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

WK:AP
F. #2023R00220

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 9, 2023

<u>By Email and ECF</u>

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Ian Diez and Ruffi Fernández</u>
      <u>Criminal Docket No. 23-CR-107 (S-2) (MKB)</u>

Dear Judge Levy:

   The government submits this letter in advance of the defendants' initial appearance and detention hearing in the above-referenced case. For the reasons stated below, the government requests that the defendants be detained pending trial. They constitute a flight risk and pose a danger to the community.

  A. <u>Background</u>

   The defendants are charged in a superseding indictment in connection with a shooting, which followed an attempted carjacking on December 12, 2022 at approximately 7:40 p.m. on a quiet residential block near Sanford Avenue and 150th Street in Flushing, Queens (the "Shooting"). Amaury Guzmán, who was already charged in the earlier indictment with a separate carjacking on November 22, 2022, is also charged with participating in the Shooting.

   Shortly before the Shooting, the victim momentarily double parked his 2020 Range Rover (the "Range Rover") when a black Infiniti sedan (the "Black Infiniti") pulled up alongside the Range Rover and parked in front of it. Surveillance video captured one of the occupants of the Black Infiniti rushing over to the driver's side of the Range Rover and making apparent contact with that side of the car.

   The victim reported that the ski mask-clad male banged on his window with a hard object. The victim became scared and reversed to clear both the male and the Black Infiniti and made a quick left turn to flee. At that moment, he heard a loud bang and realized that a bullet had torn through his passenger side window and lodged just in front of him in his center console. The Black Infiniti then chased the victim at high speed with its headlights off through

residential and commercial streets in Flushing. The victim managed to call 911 to report that he had been shot at by the occupants of the Black Infiniti. The victim managed to lose the Black Infiniti. Responding officers located the Black Infiniti and chased it with lights and sirens until the Black Infiniti got away.

Crime scene investigators recovered a discharged 9mm shell casing from the scene of the Shooting and bullet fragments from the Range Rover's center console. They also lifted a palm print from the driver's side hood of the Range Rover—the same location where the male in the ski mask approached the victim's car to bang on his window. That palm print later matched Diez's known palm print.

Cell site and data session records for Diez and Fernández also corroborated their involvement in the Shooting. Diez's data session records showed that he connected with at least one tower near the location of the Shooting around the time of the attempted carjacking. Diez's cell site records also showed movement to and from Flushing immediately before and after the Shooting. Fernández' cell site records placed him just a few blocks away from the Shooting within minutes of it taking place.

Over the course of their investigation, agents obtained a selfie-style video (the "Video") that Fernández sent to Guzmán's phone later in the evening after the Shooting took place. The Video showed what appeared to be Fernández's partial profile sitting in the back seat of a car consistent with an Infiniti sedan. The lights and sirens of a police car could also be heard blaring through the rear window of the car. Additionally, a police scanner could be overheard in the Video. After the shooting, agents compared the chatter overheard in the Video to a recording of the actual NYPD radio run and concluded that it was the same. In other words, the occupants of the vehicle in the Video were fleeing from the same officers who responded to the Shooting.

The superseding indictment demonstrates that the defendants are part of a larger pattern of violent armed carjackings of high end vehicles resulting in the victimization of innocent individuals.

B.  Defendants' Criminal History

On September 8, 2016, Fernández was convicted of Assault in the Second Degree in Queens County. In that case, the victim was approached by Fernández and others near a bus stop in front of a school. Fernández asked the victim for another person's whereabouts. When the victim responded that he did not know, Fernández punched and kicked the victim in the face. Fernández's associates also joined in the beating. The victim was later treated at a local hospital for a missing tooth and another tooth that was pushed into his gums. He was also treated for bruising, swelling and lacerations to his lip. Seven stitches were required to close a laceration on the victim's upper lip. The victim later identified Fernández in a photo array. Based on this violent conduct, Fernández was sentenced to 30 months' imprisonment.

Diez currently has an open felony matter charging him with Reckless Endangerment in the First Degree and other related charges stemming from a car chase, which

took place on January 28, 2023. Although he has not been convicted of these pending charges, the conduct alleged demonstrates a danger to the safety of the community and the serious risk of flight that he poses. In that case, police in Brooklyn attempted to stop Diez for a vehicular violation. As the officer tried to conduct the traffic stop, Diez reversed several times ramming into the officer's car and then sped away at a high rate of speed.

The officer was ultimately joined by multiple police units (including aviation) to chase Diez as he fled from police. Diez sped through multiple red lights and nearly struck innocent civilians over the course of the miles-long high-speed chase. The pursuit, which lasted nearly 25 minutes, took police through Queens and back into Brooklyn as they tried to safely stop Diez.

After a lengthy chase, police finally managed to stop the defendant. Police later learned that the sedan driven by Diez had been reported stolen in Queens on December 3, 2022. A subsequent search of the car led to the recovery of an imitation pistol from the center console of the car and a knife from the glove compartment. Diez failed to appear in state court in connection with that case on March 31, 2023. An active bench warrant remains in effect on this case.

In a post-arrest statement earlier this morning, the defendant admitted to federal agents that he has led police on numerous high-speed chases. In particular, he told agents that the chase in January was particularly intense because his sedan became airborne at a certain point during the pursuit.

   C.     Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); see also United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g); see also United States v. Jacobson, 502 F. App'x 31, 32 (2d Cir. 2012). Where the evidence of guilt is strong, it provides "a considerable incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18

(1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"). Additionally, the possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight. See Jackson, 823 F.2d at 7; United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee).

Under the Bail Reform Act, the government may proceed by proffer, United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (explaining that the government is entitled to proceed by proffer in a detention hearing); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). Furthermore, "[t]he rules of evidence do not apply in a detention hearing." United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); see also United States v. Agnello, 101 F. Supp. 2d 108, 110 (E.D.N.Y. 2000) ("[E]vidence may be supplied through proffers and hearsay information, and the rules of evidence do not apply.").

D.   The Defendants Should Be Detained

For the reasons described below, the defendants pose a significant risk of flight and a clear continuing danger to the community. Specifically, the facts indicate a reasonable likelihood that the defendants, if released pending trial, will flee, and will resume criminal activity to the detriment of the community.

Each of the factors enumerated in 18 U.S.C. § 3142(g) weighs heavily in favor of pretrial detention:

First, the defendants pose a serious flight risk, as demonstrated immediately after leading police on a high-speed chase. Diez has also shown a complete indifference to judicial orders to return to court as evidenced from his failure to appear in state court in March. The defendants additionally face a statutory maximum of 15 years in prison. These penalties give them an incentive to flee. See e.g., Jackson, 823 F.2d at 7. When the incentive to flee is so strong, no combination of sureties and other restrictions can assure the defendant's appearance. See, e.g., United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (the defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

Second, the evidence against the defendants is strong. Among other things, Diez left behind a palm print on the victim's Range Rover; cell site records place the defendants within the vicinity of the Shooting at or near the time of its occurrence; and Fernández sent Guzmán a video documenting their flight from police after the Shooting.

Third, the charged conduct is very dangerous. The charged offense involved a violent attempt to carjack a person who was merely sitting in his car on a residential block in Queens. When the victim had the courage to flee this carjacking, the defendants fired a gun at him nearly ending his life. The defendants' conduct nearly transformed what appears to have started out as an attempt to take a hard-working citizen's luxury SUV (and perhaps other

4

possessions) from him at gunpoint into a killing. A 9mm bullet lodged into the center console of the car's passenger compartment only a short reach away from the victim's body.

Their disregard for human life was not limited to the victim and the inhabitants of the residential street on which they perpetrated the shooting. The defendants' ongoing choice to endanger the community in furtherance of their attempt to steal property from the victim is evident because they unrelentingly chased the victim on the streets of Queens, thereby endangering his life and that of countless others in the community. This conduct demonstrated an utter disregard to the value of human life. The defendants' charged conduct is consistent with their history and characteristics. Fernández previously committed a violent assault against an innocent individual that required hospitalization. Diez's thrill for high-speed chases underscores his conscious disregard for the grave risk of serious injury (or even death) that flows from his dangerous pastime.

E.   Conclusion

For the reasons set forth above, the government, therefore, respectfully requests that the defendants be held without bail pending trial because no combination of conditions can ensure their reappearance or the safety of the community.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Andrés Palacio
Assistant U.S. Attorney
(718) 254-6215

cc:   Clerk of Court (CLP)
      Defense Counsel (via ECF and email)

5